## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:                                                          BKY No. 15-42460

                                                               ADV No. _____

Paul Hansmeier,

        Debtor.

Randall L. Seaver, Trustee,

        Plaintiff,

                                                **COMPLAINT**

vs.

Padraigin Browne,

        Defendant.

Randall L. Seaver, Trustee ("Trustee" or "Plaintiff") of the Bankruptcy Estate of Paul Hansmeier ("Estate"), as and for his Complaint against Padraigin Browne ("Browne"), states and alleges as follows:

### JURISDICTION AND VENUE

1.      This bankruptcy case was commenced by the filing of a voluntary petition under Chapter 13 on July 13, 2015.  The case was converted to one under Chapter 7 on December 3, 2015, and Plaintiff is the trustee.

2.      This is an action for declaratory judgment regarding bankruptcy estate property, and avoidance of the transfer of estate property, pursuant to 11 U.S.C. §§ 541, 548, 550, Fed.R.Bank.Pro. 7001(1), (2) and (9), 28 U.S.C. § 2201 and common law.

3.      This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2) and 1334.

4.      Venue in this Court is proper pursuant to 28 U.S.C. § 1409(a).

## PARTIES

5.      Plaintiff, Randall L. Seaver, is the duly qualified and acting Chapter 7 panel trustee for the bankruptcy estate of Paul Hansmeier ("Estate").

6.      Defendant Padraigin Browne ("Browne") is the spouse of the debtor Paul Hansmeier ("Hansmeier" or "Debtor") and is a resident of Minnesota.

### FACTUAL BACKGROUND

**A.      CREATION AND FUNDING OF THE MILL TRUST AND MONYET, LLC**

7.      On or about December 16, 2010, the limited liability company Monyet, LLC was organized in the state of Deleware (hereinafter "Monyet").  According to Article 8 of the operating agreement for Monyet, the Debtor is the sole manager of Monyet.

8.      According to the operating agreement of Monyet, the sole member of  Monyet is The Mill Trust.  Browne is the sole trustee of The Mill Trust.

9.      On or about December 28, 2010, Hansmeier caused the creation of the The Mill Trust, naming himself as grantor and Browne as trustee.  A copy of the trust agreement for The Mill Trust is attached to the Complaint as Exhibit A, (hereinafter the "Trust Agreement").

10.      According to the Trust Agreement:

   a. the beneficiaries of The Mill Trust are Hansmeier's parents, siblings, future spouse and any future descendants;

   b. The Mill Trust is an irrevocable trust;

   c. the trustee, Browne, had the sole discretion, subject to Hansmeier's right to veto, to distribute the assets of The Mill Trust for the benefit of the beneficiaries; and

   d. the Trust Agreement is executed by Hansmeier as "grantor" and Browne as "trustee" on December 28, 2010.

2

11.     On or about December 27, 2010, the Debtor completed an application to open a Scottrade brokerage account in the name of Monyet, LLC (hereinafter the "Monyet Scottrade Account").   The Debtor signed a personal guaranty for the Monyet Scottrade account.

12.     Beginning, at the latest, in May 2011, the Debtor began transferring funds from Alpha Law Firm into accounts held in the name of Monyet, LLC; those funds were ultimately deposited into the Monyet Scottrade Account.

13.     Hansmeier transferred in excess of $500,000 into an account or accounts at TCF Bank held in the name of Monyet, LLC, and ultimately in August, 2012 into the Monyet Scottrade Account.  At least some of those monies were transferred to  Monyet's TCF bank account from Alpha Law Firm.

14.     The Alpha Law Firm was a law firm wholly owned by the Debtor at the time of the transfers to Monyet.

**B.     HANSMEIER'S LITIGATION**

15.     In 2012, Hansmeier was engaged in multiple lawsuits representing plaintiffs in various copyright based lawsuits. Beginning in early 2013, those lawsuits began to unravel, resulting, for the most part, in Hansmeier or related associates voluntarily dismissing their claims.

16.     In conjunction with the various dismissals, the defendants or parties served with discovery demands from Hansmeier or his associates, sought recovery of attorney's fees and/or sanctions.

3

17.     Hansmeier was found personally liable for attorneys fees or sanctions in the

following cases:

| Case | Award Date | Award Amount |
|------|-----------|--------------|
| a.  Ingenuity 13, LLC v. John Doe<br>U.S. District Court<br>District of California | May 6, 2013 | $81,319.72 |
| b.  AF Holdings, LLC v. Chowdhury<br>U.S. District Court<br>District of Massachusetts | October 22, 2013 | $64,180.80 |
| c.  Lightspeed Media Corp. v. Anthony Smith<br>U.S. District Court<br>Southern District of Illinois | November 27, 2013 | $261,025.31 |
| d.  Guava, LLC v. Spencer Merkel<br>Fourth District of Minnesota<br>Hennepin County District Court | January 20, 2015 | $63,367.52 |

### C.     HANSMEIER'S SCHEME TO DEFRAUD CREDITORS

18.     As early as 2012 Hansmeier was using Alpha Law Firm to conceal funds from

creditors.

19.     In *Guava, LLC v. Spencer Merkel*, following post-judgment discovery the

district court found that Hansmeier intentionally liquidated and transferred funds from the

Alpha Law Firm during the pendency of that case, and stated the following regarding

Hansmeier's actions:

> The district court also found that Hansmeier was using Alpha as a façade to perpetrate
> fraud on the court, citing the fact that Hansmeier and Dugas misrepresented which of
> them was employed by Alpha and Hansmeier later attempted to convince the court that
> Prenda Law, not Alpha, was the law firm of record for Guava.

See *Guava, LLC v. Merkel*, 2015 WL 4877851, at 7 (Minn. App. Aug. 17, 2015)(citing district

court holding).

20.    By placing over $500,000 into the Monyet Scottrade Account, Hansmeier was able to continue to exercise ownership and control of those funds without those funds being exposed to creditors, or the courts.

21.    Shortly after transferring funds from Alpha Law Firm to Monyet, LLC, Hansmeier began to suffer significant financial setbacks as a result of sanctions and attorney's fees being awarded against him personally, as a result of his law practice activities.  A timeline showing some of the events taking place in Hansmeier's legal practice is attached as Exhibit B.

22.    From May 2013 through May 2014, Hansmeier, as the sole signatory on the Monyet Scottrade Account, individually authorized and directed 19 wire transfers from the Monyet Scottrade Account, transferring over $632,139.00 out of the Monyet Scottrade Account.

23.    On November 22, 2013, less than two weeks after the U.S. District Court for the Southern District of Illinois heard a motion for an award of attorney's fees and expenses against Hansmeier in the Lightspeed case, he transferred $175,000 from the Monyet Scottrade Account to a TCF account held solely in the name of Browne.

24.    A judgment in the amount of $261,025.31 was entered against Hansmeier and others personally on November 27, 2013 in the U.S. District Court for the Southern District of Illinois.

25.    After Hansmeier had transferred $175,000 into the TCF Bank account held solely in Browne's name(the "TCF Account"), Browne contacted TCF Bank and made arrangements for a TCF Bank branch to have $150,000 of cash on hand so that Browne could make a $150,000 cash withdrawal.  Browne then went to the bank on December 13, 2013 and withdrew $150,000 in cash from the TCF Account.  She then took the $150,000 in cash to the condominium, shared by her and Hansmeier, where it was then hidden in a box in their closet.

5

26.     On January 8, 2014, the defendant in the Hennepin County District Court action

*Guava, LLC v. Spencer Merkel* filed a motion to add Hansmeier, in his individual capacity, as a

judgment debtor, which would make him personally liable for a judgment exceeding $60,000.

27.     On February 7, 2014, Hansmeier transferred an additional $70,000 from the

Monyet Scottrade Account to the TCF Account.

28.     Browne, after checking with TCF Bank to see what would be an appropriate

amount that the bank branch would have "on hand" without making pre-arrangements, began to

withdraw additional cash from the bank in $2,000 increments.

29.     In the months of February-March, 2014, Browne withdrew at least $28,000 in

cash from the TCF Account.  She had also withdrawn $2,000 in cash from the TCF Account in

November of 2013.  Those cash withdrawals, when added to the $150,000 in cash already hidden

at Browne and Hansmeier's home, resulted in a total of approximately $180,000 in cash hidden

in a box at the home shared by Hansmeier and Browne.

30.     Hansmeier and Browne believed that turning the $180,000 into cash and hiding it

in a box in their home would make it difficult, if not impossible, for Hansmeier's creditors to

trace or recover any of those funds.

31.     From May 2013 through May 2014, Hansmeier transferred over $632,000.00 out

of the Monyet Scottrade Account, prior to any creditor discovering the existence of that account.

32.     On June 5, 2015, Judge Herndon of the United States District Court for the

Southern District of Illinois ordered sanctions and found Hansmeier in contempt.  After

conducting post-judgment discovery, and the court was presented with information regarding the

Debtor's use of the Monyet Scottrade Account, the Court stated the following:

6

As to Hansmeier, Smith presents evidence that, in the years leading up to the judgment against him, Hansmeier had transferred nearly half a million dollars to a company called Monyet LLC (Doc. 172-21), of which Hansmeier was the sole member, manager, and signatory for its accounts ((Doc. 197-2). In a debtor's exam of a related proceeding in June 2014, Hansmeier admitted that Monyet, LLC was set up as a trust for his son for purposes of estate planning (Doc. 190 Ex. D 38:11-12, 18). However, documents from Scottrade, Inc. reveal that Monyet, LLC was not solely associated with estate planning, as the bulk of its assets went towards expenses such as payment of appellate bonds and attorney's fees, investments in Livewire Holdings, LLC, and loans to his Class Justice LLC law firm (Doc. 190-3). Said expenditures occurred throughout the 2013 year and up to May 2014, demonstrating that Hansmeier had access to the Monyet funds both before and after he pled insolvency to the court.

33.     Judge Herndon's Order disposed of Hansmeier's arguments that he lacked the means to satisfy the judgment entered against him, and establishes that Hansmeier was using the Monyet Scottrade Account funds as his own, and with no reservation or restriction.

### D.    HANSMEIER AND BROWNE'S SWORN STATEMENTS REGARDING MONYET, LLC, TRANSFERS AND CASH IN CONTINUATION OF THE SCHEME TO DEFRAUD CREDITORS

34.     Hansmeier has provided false or misleading testimony to courts, creditors and the Chapter 7 trustee about his financial affairs.

35.     On June 30, 2014, Hansmeier was deposed in *Guava v. Spencer Merkel*, which was after Hansmeier had transferred over $600,000 from the Monyet Scottrade Account but before defendant's counsel had gained knowledge of those transfers.  On that day, there was still more than $100,000 hidden in a box in Hansmeier's home, because after June 30, 2014 Browne made cash deposits exceeding $100,000.  Despite that fact, Hansmeier testified as follows:

Q(attorney Sheu):  How about a transaction three years ago May 3rd, 2011, Alpha Law Firm made a $75,000 check to Monyet, M-o-n-y-e-t, LLC, does that ring a bell?

A(Hansmeier):  No.

Q:  Do you know what Monyet, LLC is?

7

A:  It's presumably a limited liability company.

Q:  I see you're the signatory to the check and you're also the signatory on the back of the check.  You don't know what Monyet, LLC is?

A:  To the best of my recollection the Monyet, LLC entity is simply an account associated with estate planning but I don't know -- the reason, I can't tell you how it operates within the whole estate planning scheme is because I did not set up the estate planning myself that's something that's well beyond my expertize.

36.    On July 2, 2014, the debtor was questioned further in *Guava, LLC v. Spencer*

*Merkel*.  On that day, there was still more than $100,000 hidden in a box in Hansmeier's home.

Despite that fact, on that day, Hansmeier provided the following sworn testimony:

MR. SHEU:  Well Your Honor, there's $515,000.00 transferred to Monyet, LLC and Mr. Hansmeier says he hardly knows anything about this entity where it's located and where it was organized.

Q:  So this Monyet, LLC was set up for your family, the three you just mentioned?

A:  As I've testified.

Q:  Do you know where this money is located?

A:  I do not.

Q:  Well how would you ever as beneficiary of this money ever get any of it?

A:  I don't think I could get any of it.

37.    Unknown to the court, or Mr. Sheu, at the time of this testimony, Hansmeier had

already authorized the transfer of over $600,000 of these funds from the Monyet Scottrade

Account, including a total of over $250,000 into accounts held solely in the name of Browne.

38.    Also unknown to the court of Mr. Sheu at the time of Hansmeier's July 2, 2014

testimony was the fact that over $100,000 of that cash was still hidden in a box in Hansmeier's

home.

8

39.     At the time of the July 2, 2014 testimony, Hansmeier had personal knowledge of the exact disposition he had made of the funds in the Monyet Scottrade Account.

40.     At the time of July 2, 2014 testimony, Hansmeier knew a substantial amount of the funds from the Monyet Scottrade Account had been reduced to cash, located in a box, in a closet in his home.

41.     On July 13, 2015, Hansmeier filed a Chapter 13 bankruptcy petition.  In his schedules filed with the petition, signed under penalty of perjury, Hansmeier stated at Schedule B, Item 2, that $8,554 was held in a "self-settled trust Monyet" and was jointly owned.  He stated that he had no cash on hand.  A copy of the Debtor's Schedule B is attached as Exhibit C.

42.     The Debtor's statement of financial affairs disclosed a July 8, 2015 payment from the Debtor to his attorney in the amount of $15,000.  That payment was made by a check drawn on an Associated Bank account held in Browne's name.  The funds in the account, which covered the check, were from a July 9, 2015 $20,000 deposit of some of the hidden cash.

43.     After the filing of his Chapter 13 petition and schedules, Rule 2004 examinations of Hansmeier and Browne were taken on the same day.  By that time, creditor's attorney Sheu was in possession of certain financial records for the Monyet Scottrade Account.

44.     At the October 28, 2015 Rule 2004 examination of Padraigin Browne, which occurred before that of Hansmeier, Browne provided the following testimony regarding The Mill Trust and Monyet:

Q(Sheu): Okay.  Is the Mill Trust still in existence today?

A(Browne): I don't know how to answer that. I guess so, yes.

Q: And what is the purpose of the trust?

A: To provide for our family expenses.

9

Q: How is it funded?

A: Through transfers from Paul and from his companies.

Q: How much is in it now?

A: Approximately $8,000.

…

Q(Sheu): Who would know most about Monyet and the Mill Trust?

A: Paul was the manager of the, of Monyet.

Q: You were the trustee, weren't you?

A; I was the trustee of the Mill Trust.

Q: And as trustee of the Mill Trust, what were your obligations or duties?

A: I was in charge of using the money as I saw fit for our family.

45.     According to Browne, there remained "approximately $8,000" in cash on October 28, 2015.   A copy of the October 28, 2015 testimony of Browne is attached as Exhibit D.

46.     Browne testified in her February 18, 2016 Rule 2004 examination, conducted by the trustee, that her testimony given in her October 28, 2015 examination was truthful.

47.     When questioned under oath by the trustee on February 18, 2016, Browne testified that she deposited over $20,000 of the hidden cash into her checking account after Hansmeier's Bankruptcy filing.  She admitted that there was at least $20,900 of cash remaining hidden in her closet on the filing date.

48.     When questioned on October 28, 2015 regarding the $175,000 transfer from the Monyet Scottrade Account to Browne, Browne testified that the transfer to her was "for personal and everyday living expenses."

49.     When questioned on October 28, 2015 regarding the $70,000 transfer from the

10

Monyet Scottrade Account to Browne, Browne testified that the money was used for "everyday living expenses".

50.     On October 28, 2015, Hansmeier was again asked questions, while under oath, about, among other things, the Monyet Scottrade Account and what happened to the funds transferred from the account.  Some of his testimony is as follows:

> Q: I'll have you flip ahead to the authorization to wire brokerage funds, a series of documents I went through with your wife.  The first one is the posting of an appellate bond that looks like a payment to SureTec for the Ingenuity 13 case, is that right?
>
> A: Yes.
>
> Q: So why, why are you paying it out of your trust, your estate planning vehicle rather than from your personal bank account or the law firm operating account?
>
> A: Well, I didn't personally have the money at that time to post the bond.
>
> …
>
> Q:  The next one is $25,000 to it looks like you're starting up Class Justice, PLLC around that time, July of 2013?
>
> A: Yeah, I think that's when Class Justice, PLLC was formed, sometime in July 2013, correct.

51.     Hansmeier has confirmed that a majority of the transfers he authorized from the Monyet account were either for his personal benefit or for one of his related business entities.

52.     Hansmeier testified that he transferred approximately $120,000, from the Monyet Scottrade Account to SureTec Insurance Company, which was collateral on an appellate bond. Hansmeier scheduled that collateral as an asset of his personal bankruptcy estate in his Schedule B filed with the court on July 13, 2015, describing the asset as:

> One half interest in supercedeas bond posted with appellate court in Ingenuity 13, LLC v. John Doe, Case #2:12-cv-08333-ODW-JC Matter.  **Debtor contributed $118,791** and his codebtor contributed the rest of a $237,583.66 supercedeas

11

bond. Underlying amount on appeal is $81,319.79.

(Emphasis added).  See Exhibit C.

53.     As evidenced by the testimony of Hansmeier and Browne, Hansmeier was using the Monyet Scottrade Account as his personal account, and for whatever purposes he deemed appropriate.

54.     When questioned under oath, on October 28, 2015, Browne either professed ignorance as to the purpose of the various wire transfers leaving the Monyet Scottrade Account, or claimed that she could not remember, or did not know their purpose.

55.     Hansmeier's bankruptcy case was converted from a case under Chapter 13 to one under Chapter 7 on December 3, 2015.  After appointment of the Trustee, through use of Rule 2004 authorization the Trustee obtained documents from TCF Bank evidencing the deposit of substantial monies from the Monyet Scottrade Account to Browne's TCF Account, and their subsequent cash withdrawals.

56.     At the Debtor's initial 341 meeting of creditors held in his Chapter 7 case, before the trustee had uncovered the truth about the cash withdrawals, the Trustee inquired as to the transfer of $175,000 from the Monyet Scottrade Account to Browne and her subsequent withdrawal of $150,000 from her personal account, Hansmeier testified as follows:

> Q(Trustee): And then here's a page of a TCF statement – or two pages of a statement for the same time period that's showing that $175,000 deposit into your wife's account, correct?  It's down in the lower left.
>
> Ms. May: What is that time period?
>
> A(Hansmeier): This is November 22, 2013.  I guess that's what it shows, yes.

12

Q: Okay. And then if you look over in the withdrawal section, which is on the right side, you'll see on December 13 there's a $150,000 withdrawal.  Do you see that?

A: I do.

Q: What happened to that $150,000?

A: I think it was used to pay for household expenses.  Around this time my wife either was pregnant or she had just lost her job, so she was using that to pay for the mortgage and …

Q: How was the $150,000 withdrawn?  Here's what I mean by that: Was it in a series of money orders, cashier's checks, was it one $150,000?

A: I don't know the answer to that question.

Q: Okay. And other than what you've testified to, you don't know what happened to that $150,000?

A: Yeah.  I believe it was used for household expenses.

Q: Would it have been deposited into accounts after this, after it was withdrawn from this account?

A: I'm not sure what – I mean, I just don't know what – What her method of withdrawing it was.

Q: You weren't involved at all in that 150,000 withdrawal from TCF?

A: Well, I was certainly aware that she was withdrawing the money.  I just don't know, like, the particular mechanics of it.  I'm sure she won't.

…

Q: … Then there's a $70,000 transfer to your spouse on February 7 of 2014. What was that for?

A: That would have been, again, to pay for the costs of living.  She was either pregnant at that time, so she was out of work, or maybe she was on maternity leave at that time.  Anyway, so it would have been to cover expenses and costs.

57.     At the time of the Debtor's January 21, 2016 testimony at the § 341 meeting

of creditors, the Debtor knew that funds withdrawn from Browne's TCF Account were

withdrawn in cash.

58.     At the continued § 341 meeting of creditors held on February 25, 2016, which

was after the trustee's Rule 2004 examination of Browne, Hansmeier testified as follows

when questioned again about Browne's withdrawals:

> Q(Trustee):  Okay.  And let's back up a little bit.  She withdrew 150,000 in cash from TCF Bank after you wired 175,000 into an account held in her name, correct?
>
> A(Hansmeier):  If that's her testimony.  I did not participate in the transaction.
>
> Q:  But you knew that she was withdrawing 150,000 in cash, correct?
>
> A:  I was aware that she was withdrawing cash.  I wasn't aware of the precise amounts.
>
> Q:  You knew it was a large amount of money?
>
> A:  Yes.
>
> Q:  Okay.  And then you knew that after you made the $70,000 transfer to her, you knew tha she was withdrawing a good amount of that in cash, as well, correct?
>
> A:  I don't recall the specifics of that.  I know she did the initial large withdrawal. And from that point on – I know she was – Her intention was to get it into cash, yes.
>
> Q:  Okay.  Did you help her count the $150,000 cash withdrawal?
>
> A:  No.
>
> Q:  But you knew it was in a box, stored in a box in your house after she withdrew[sic] it, correct?
>
> A:  Yes.

59.     Contrary to his sworn testimony, Hansmeier was also aware of the fact that a portion of the cash taken out from Browne's TCF Bank account was transferred to John Steele in either 2013 or 2014.

60.     Padraigin Browne was examined pursuant to Rule 2004 on February 18, 2016 and testified as follows regarding the funds she withdrew from the TCF Account:

> Q: And then there's – back in the Withdrawals section, there is a $150,000 withdrawal.  Do you see that?
>
> A: Yep.
>
> Q: And that's a cash withdrawal, isn't it?
>
> A: That is correct.
>
> Q: So you withdrew $150,000 in cash from this account on December 13, correct?
>
> A: Yes.
>
> …
>
> Q: And why did you take out 150,000 in cash?
>
> A: Because we were – I wanted to make sure that we were still able to make our payments on our everyday living expenses.  We had recently had a judgment entered against Paul without him being served at all or being aware of it and I was concerned that, because the attorneys that were representing people against him were getting things without letting us know, that they would freeze my account without ever letting us know and we wouldn't be able to pay for things.
>
> Q: So you were concerned if you left the money in the account that somehow it would get tied up by some creditor?
>
> A: Without notice.
>
> Q: Okay.
>
> A: So in Massachusetts – I think it was in Massachusetts, there was a case that we never heard of, neither of us were ever aware of, and then they got a judgment for over $70,000 entered against Paul in his name, and so I was very

concerned that if they could get a judge to do that without ever serving him with anything, that they could also get our – get my bank accounts frozen without me being made aware of and being able to contest their right to access that money.

…

Q:Sure.  You filled out some form to authorize them to take the 150,000 out of your account?

A: Yeah.  I don't remember what the form looked like or anything, but yes.

Q: Sure, okay.  And it was all in $100 bills?

A: Yes.

Q: And did they put it in a box for you?

A: Yes.

Q: Okay.  How big was the box?

A: About the size of a sheet of paper.

Q: A sheet of paper?

A: Yeah.

Q: Okay.  And then what did you do with it after that?  What did you do with the box of money after that?

A: I put it in the closet.

Q: Okay.  So it was sitting in the closet.  It wasn't locked up or anything in the closet?

A: That's correct?

Q: Okay.  So both you and Mr. Hansmeier had access to it in the closet?

A: Yeah.

61.    A condensed copy of the transcript of Browne's February 18, 2016 Rule 2004

examination is attached hereto as Exhibit E.

16

62.     Browne testified further that Hansmeier deposited an additional $70,000 into the TCF Account in February of 2014 and she proceeded to withdraw additional funds, which when added to the $150,000 withdrawal totaled approximately $180,000.  All of these efforts were taken to keep the monies out of the reach of creditors.  A majority of the funds were subsequently deposited into an Associated Bank account held solely in Browne's name.

63.     After being confronted with evidence of her cash withdrawals and deposits, at her February 18, 2016 examination, Browne admitted that a large portion of cash was unaccounted for as of the filing date.  In response, and for the first time, Browne provided the following explanation:

> Q: Even if that is cash.  So 79 and 35 gets you to 114,000.  That leaves $66,000 of cash that we don't see coming into any of these accounts?
>
> A: Yeah.
>
> Q: Where is the money?
>
> A: It went to John Steele to pay for one of the bonds for the appeal.
>
> Q: How much went to Mr. Steele?
>
> A: I think 60.
>
> Q: When did that go to him?
>
> A: I don't remember the date.
>
> Q: Can you give me a rough idea?
>
> A: It would have been in 2013 or 2014 and it would have – I believe it was for the Lightspeed appeal, so you should be able to figure out – I mean, I don't know the dates, but –
>                                        …
>
> Q: So somehow did you get that money to Mr. Steele?

17

A: He was coming up to visit, so instead of going in, depositing the money and writing him a check, we just gave him the cash.

Q: When you say "we" it's you and Mr. Hansmeier that you're referring to?

A: Yes.

64.    Hansmeier and Browne's prior testimony regarding the use of monies transferred to Browne concealed or omitted disclosure of the supposed $60,000 transfer to Mr. Steele.

65.    During the February 18, 2016 examination of Browne, she also revealed that Hansmeier's verified schedules falsely indicated the amount of funds in the "Self Settled Trust Monyet".  Browne testified the following regarding those funds:

Q: So you had to have at least 20,900 in cash in your possession on July 13 of 2015?

A: Yes, and I'm saying when we filed, I had spent that money, the 15,000 already, approximately, on various things and was paying – so I said that not there because I need to pay off my credit card, and then I deposited it afterwards.  Just because he hadn't – just because he listed 8,500, we said, well, we've already spent that money on a credit card, we just haven't paid it off yet, so we're going to say that that's not there, and then the 5,000 is part of the 8,000 that we were still saying was part of the trust.

Q: So you and Mr. Hansmeier sat down and counted out how much money was left there, correct?

A: Yes.

Q: Okay.

A: Pretty close, I mean, there was probably some ones and stuff lying around.

Q: And what did you come up with for a total?

A: I don't remember exactly how much it was.

Q: Okay.  And then you and he talked and decided rather than stating how much cash was actually there, you would deduct for cash that was – for things that you were going to pay in the future?

A: For things that had already been purchased on my credit cards that needed to be paid off.  They had already – I had already, essentially, bought them, we had the things.

66.    Browne and Hansmeier's actions from 2012 to present are consistent with and constitute a scheme to hinder, delay and defraud creditors.

## CLAIMS

### COUNT 1
### PIERCING OF THE CORPORATE VEIL
### THE MILLS TRUST AND MONYET, LLC ARE
### THE ALTER EGOS OF HANSMEIER

67.    The evidence provided by the Plaintiff evidences the fact that The Mills Trust and Monyet, LLC were for all purposes the alter egos of Hansmeier, and their legal form should be disregarded.

68.    A majority, if not all of funds which comprised the assets of Monyet, LLC were transferred from Alpha Law Firm, Hansmeier's law firm which was held to be a mere façade to defraud creditors, by the Hennepin County District Court in *Guava, LLC v. Spencer Merkel*.

69.    Hansmeier asserted complete control over the funds, and the use of the funds, held in the Monyet Scottrade Account, and was the only signatory on that account.

70.    Browne is the purported trustee of the Mill Trust, yet she had no control over the funds which comprised the assets of The Mill Trust.

71.    Hansmeier made numerous transfers from the Monyet Scottrade Account that were for his benefit alone, disregarding the purpose and intent of The Mill Trust.

19

72.     Many of the transfers from the Monyet Scottrade Account, including loans to and capitalization of his latest law firm, and were made with no documentation evidencing the purpose of the transfers or any terms of repayment.

73.     Hansmeier used Monyet, LLC and the Monyet Scottrade Account to conceal funds from his creditors, and as sanctions and judgments were being imposed, he depleted the account in similar fashion to his liquidation of the Alpha Law Firm account.

74.     At item 18 in the statement of financial affairs filed with this court on July 13, 2015, under penalty of perjury, Hansmeier concealed his interest and position as sole manager of Monyet, LLC.

75.     Almost all of the funds that were initially transferred into the Monyet Scottrade Account have been dissipated by Hansmeier.

76.     The facts in case establish that Monyet, LLC and The Mills Trust are the alter egos of Hansmeier, and the funds in the Monyet, LLC account were his personal funds.

### COUNT 2
### FRAUDULENT TRANSFERS
### 11 U.S.C. § 548(a)(1)(A)

77.     Plaintiff realleges and reaffirms the foregoing paragraphs of this Complaint.

78.     Pursuant to Count 1, the funds in the Monyet Scottrade Account were the Debtor's property.

79.     In the two years prior to the filing of the Debtor's bankruptcy petition he transferred at least $280,000 to his spouse, Padraigin Browne.

80.     At least the following two transfers were made to Browne with the specific intent to hinder, delay or defraud Hansmeier's creditors:

      a.      $175,000.00 – November 22, 2013

        b.        $70,000.00 – February 8, 2014

(Hereinafter referred to collectively as the "Pre-Petition Transfers").

      81.    As described in the foregoing paragraphs of this Complaint, and in the following factors set forth in Minn. Stat. § 513.44(b), the Pre-Petition Transfers to Browne satisfy a majority of the badges of fraud, evidencing the Debtor's fraudulent intent:

a. The Pre-Petition Transfers were to an insider; Browne was the spouse the Debtor at the time of the Pre-Petition Transfers and is a statutory insider pursuant to 11 U.S.C. § 101(31).

b. The Debtor retained possession or control of the property transferred after the transfer; the transferred funds were initially placed in Browne's personal bank account, but were then reduced to cash and placed in a closet in the Debtor's home.

c. The transfer was concealed; the Debtor provided false testimony and filed bankruptcy to avoid disclosing financial information in State court. Hansmeier omitted from his Statement of Financial Affairs, at item no. 18, his status as the sole Manager of Monyet, LLC.

d. Before the transfer was made the debtor had been sued or threatened with suit; at the time of the Pre-Petition Transfers to Browne the Debtor had already been found liable for substantial attorney's fee awards. Nine days prior to the $175,000 transfer to Browne, the Debtor was party to a motion in the United States District Court of the Southern District of Illinois where the court held a hearing on a motion to hold the Debtor personally liable for attorneys' fees and expenses totaling over $250,000. At the time of the February 7, 2014 transfer to Browne, a motion had been filed to hold Hansmeier liable for yet another award of attorney's fees in the Fourth Judicial District of the State of Minnesota.

e. The transfers were of substantially all of the debtor's non-exempt assets; the Pre-Petition Transfers were part of over $250,000 in transfers from Hansmeier to Browne, which constituted a substantial portion of the Debtor's non-exempt assets at that time.

f. The debtor removed or concealed assets; the Pre-Petition Transfers to Browne removed the funds from the reach of the Debtor's creditors, and Hansmeier testified in a misleading or false manner about the funds in order to conceal those funds.

g.  The Debtor received no value in consideration of the transfers.

h.  The transfer occurred shortly before or shortly after a substantial debt was incurred; five days after the transfer of $175,000 to Browne, judgment was entered against Hansmeier in the amount of $261,025.31.  As evidenced herein, and in the outline at Exhibit B, the Pre-Petition Transfers to Browne were made at a time when creditors were obtaining judgments and sanction orders against the Debtor.

i.  Browne was aware of the Debtor's financial difficulties and admitted that she liquidated a large portion of the Pre-Petition Transfers shortly after they were transferred to her from the Debtor in order to avoid creditors freezing the funds.

82.    Plaintiff is entitled to the avoidance of the Pre-Petition Transfers totaling $245,000 to Browne, and recovery of the Pre-Petition Transfers pursuant to 11 U.S.C. § 550.

WHEREFORE, the trustee seeks an Order from the Court:

1.    Holding that the legal form of The Mills Trust and Monyet, LLC are disregarded and the entities are deemed the alter egos of Paul A. Hansmeier.

2.    Holding that the Debtor's transfer of monies totaling $245,000 to Padraigin Browne constitute fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A), and the Plaintiff is entitled to avoidance of those transfers and recovery of the amount of $245,000 pursuant to 11 U.S.C. § 550.

3.    Entering judgment in the amount of $245,000 against Padraigin Browne and in favor of the Plaintiff Randall L. Seaver, trustee.

4.    Granting such other and further relief as is appropriate.

22

**FULLER, SEAVER,
SWANSON & KELSCH, P.A.**

Dated: <u>March 17</u>, 2016                    By: <u> /e/ Matthew D. Swanson              </u>
                                            Randall L. Seaver                    152882
                                            Matthew D. Swanson                390271
                                            12400 Portland Avenue South, Suite 132
                                            Burnsville, MN 55337
                                            (952) 890-0888; (952) 890-0244 (fax)
                                            [mswanson@fssklaw.com](mailto:mswanson@fssklaw.com)

                                            Attorneys for Plaintiff