# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

_____

BKY No.  15-42460

In re:

Paul Hansmeier,

        Debtor.

_____

ADV No. 16-4031

Randall L. Seaver, Trustee,

        Plaintiff,

vs.

Padraigin Browne,

        Defendant.

_____

### NOTICE OF HEARING AND MOTION
### FOR PREJUDGMENT ATTACHMENT

_____

To:    Padraigin Browne and her attorney David Burns; 301 4th Ave. S., Suite 270, Minneapolis, MN 55415.

    1.    Plaintiff, Randall L. Seaver, Trustee ("Trustee") for the Bankruptcy Estate of Paul Hansmeier ("Estate"), by his attorneys, moves the Court for a prejudgment attachment and gives notice of hearing.

    2.    A hearing on this motion will be held at 2:30 p.m. on May 10, 2016 in Courtroom 8W, U.S. Bankruptcy Court, 300 South Fourth Street, Minneapolis, MN 55415, to determine whether or not the Plaintiff is entitled to prejudgment attachment.

3.      Pursuant to Minnesota Statute § 570.026 Subd. 2, the movant is required to notify Defendant that the hearing is "to determine whether the sheriff shall seize nonexempt property belonging to you [Defendant] to secure a judgment that may be entered against you[Defendant].   The Plaintiff is currently in possession of the nonexempt funds and therefore the statutory language is partially moot.

4.      You may attend the court hearing alone or with an attorney.  After you have presented your side of the matter, the court will decide what should be done with your property until the lawsuit which has been commenced against you is finally decided.

5.      Any response to this motion must be filed and served by delivery not later than May 5, 2016 which is five days before the time set for the hearing (including Saturdays, Sundays and holidays).  UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

6.      Minnesota Statute § 570.026 also requires Plaintiff to provide the following notices to Defendant:

> If the court directs the sheriff to seize and secure the property while the lawsuit is pending, you may still keep the property until the lawsuit is decided if you file a bond in an amount set by the court.

> IF YOU DO NOT ATTEND THIS HEARING, THE COURT MAY ORDER YOUR NONEXEMPT PROPERTY TO BE SEIZED.

7.      The petition commencing the Chapter 13 case was filed on July 13, 2015.  The case was converted to one under Chapter 7 on December 3, 2015.  The case is now pending in this court.

8.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§157 and

1334, Bankruptcy Rule 5005, 7065, 7005 and Local Rule 7005-3.  This motion arises under

Minn. Stat. § 570.02, applicable in accordance with F. Bank. R. 7064 and F.R.Civ.P. 64.

9.     Plaintiff files this motion seeking an order of prejudgment attachment in the

Defendant's property to secure the satisfaction of a judgment sought by Plaintiff.

10.     On March 17, 2016, the Plaintiff commenced adversary proceeding no. 16-

4031 by the filing of a complaint(the "Complaint"), seeking judgment in the amount of at

least $245,000 against the Defendant Padraigin Browne.

11.     As set forth in the Complaint, and Plaintiff's affidavit filed herewith:

   a.  Defendant has secreted and disposed of non-exempt assets with the intent
       to hinder, delay and defraud creditors.

   b.  Defendant withdrew funds from her financial institution and converted
       them to cash in order to prevent creditors from learning of or gaining
       access to the assets.

   c.  Defendant has provided false testimony to this court in her October 2015
       Rule 2004 Examination in order to avoid disclosing the truth regarding
       her and the debtor's finances and transfers.

   d.  The Defendant conspired with the debtor to mislead this court and to
       mislead and defraud the bankruptcy estate and trustees by falsely
       representing the amount of cash in possession of the debtor and the
       Defendant as of the date of filing.

12.     Pursuant to this Court's order of December 3, 2015, the Plaintiff is currently

holding funds from the sale of real property owned by Paul Hansmeier and Padraigin Browne

("Sale Proceeds").  Padraigin Browne has an interest in some of the Sale Proceeds.

13.     Plaintiff requests that the court grant Plaintiff an order of attachment in the

non-exempt portion of the Defendant's interest in the Sales Proceeds, as set forth in the

3

Complaint. The Plaintiff believes the Defendant's non-exempt portion of the Sales Proceeds totals in excess of $65,000, but no more than the judgment amount sought in Adversary Proceeding No. 16-4031.

14.     As set forth herein, as well as the attached affidavit of Randall L. Seaver, and the Complaint filed in Adv. No. 16-4031, grounds exist under Minn. Stat. 570.02 for entry of an order of attachment in the funds currently in the possession of the Plaintiff. The Plaintiff requests that the Court issue its order as follows:

1.     Granting the Plaintiff's motion for prejudgment attachment.

2.     Holding that the Defendant's interest in the proceeds from the sale of real property, currently in the possession of the Plaintiff, are hereby attached as security for the satisfaction of the judgment sought by Plaintiff in Adversary No. 16-4031.

3.     Holding that in accordance with this Order, Plaintiff shall continue to maintain possession of the Defendant's interest of the Sale Proceeds pending further order of this Court.

4.     For such other and further relief as the court deems just and equitable.

**FULLER, SEAVER
SWANSON & KELSCH, P.A.**

Dated: April 13, 2016          By: /e/ Matthew D. Swanson
                                                Matthew D. Swanson          390271
                                                Randall L. Seaver              152882
                                                12400 Portland Avenue South, Suite 132
                                                Burnsville, MN 55337
                                                (952) 890-0888; (952) 890-0244 (fax)
                                                mswanson@fssklaw.com

                                                Attorneys for Plaintiff

## **VERIFICATION**

I, Randall L. Seaver, the Plaintiff in Adv. No. 16-4031, and Chapter 7 Trustee in the underlying bankruptcy case, states under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on April <u>13</u>, 2016            <u>_/e/ Randall L. Seaver    _____</u>
                                                        Randall L. Seaver, Trustee

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| In re: | Bky No. 15-42460 |
|  | Chapter 7 Case |
| Paul Hansmeier, |  |
| Debtor. |  |

|  |  |
|---|---|
|  | ADV No. 16-4031 |
| Randall L. Seaver, Trustee, |  |
| Plaintiff, |  |
| vs. |  |
| Padraigin Browne, |  |
| Defendant. |  |

### Memorandum in Support of Plaintiff's Motion for Prejudgment Attachment

### INTRODUCTION

The Plaintiff's motion seeks entry of an order for prejudgment attachment, securing the Plaintiff's claim with funds currently in the possession of the Plaintiff.   Pursuant to this court's December 3, 2015 Order, the Plaintiff is in possession of the net sale proceeds from the sale of the Defendant's homestead.  Plaintiff commenced adversary case no. 16-4031 to determine the appropriate allocation of the net sales proceeds.  A portion of the net sales proceeds are non-exempt property of the Defendant and are subject to attachment.

### FACTUAL BACKGROUND

In December 2010, Paul Hansmeier ("Debtor" or "Hansmeier") caused the limited liability company Monyet, LLC to be organized in the state of Deleware (hereinafter "Monyet").  According to Article 8 of the operating agreement for Monyet, the Debtor is the sole manager of

Monyet.   According to the purported operating agreement of Monyet, the sole member of Monyet is The Mill Trust.  However, communication from the Internal Revenue Service appears to state that the sole member is Lee S. McCullough, III. Seaver Aff. Ex. 16.

Also in December 2010, Hansmeier caused the creation of the The Mill Trust. The trust agreement for The Mill Trust provides the following:

    a.   The named beneficiaries of The Mill Trust are Hansmeier's parents, siblings, future spouse and any future descendants;

    b.   The Mill Trust is an irrevocable trust;

    c.   the trustee, Browne, had the sole discretion, subject to Hansmeier's right to veto, to distribute the assets of The Mill Trust for the benefit of the beneficiaries; and

    d.   the Trust Agreement is executed by Hansmeier as "grantor" and Browne as "trustee" on December 28, 2010.

See Swanson Aff. Ex. 4 at 1[1].  A copy of the trust agreement for The Mill Trust is attached to the Swanson Affidavit as Ex. 4.

Despite Hansmeier's representations to this Court at Schedule B, Monyet is not a "self settled trust".  Seaver Aff. Ex. 1 at 1.  Monyet is simply a limited liability company through whose accounts Hansmeier funneled hundreds of thousands of dollars.  See Seaver Ex. 15 and Ex. 11.

Information regarding the identity of the member of Monyet, LLC is contradictory. Communication from the Internal Revenue Service indicates that the sole member is Lee S. McCullough, III.  Seaver Aff. Ex. 16.  The purported operating agreement of Monyet, LLC states that it is The Mill Trust.  That purported operating agreement appears to have been altered by deletions in many places.  Swanson Aff. Ex. 6.  And the Debtor claims to be the owner on his Schedule B.  Seaver Aff. Ex. 1 at 1.

---

[1] "Swanson Aff." refers to the Affidavit of Matthew D. Swanson.

<u>Hansmeier Transfers Money to Monyet, LLC</u>

As will be seen, Hansmeier did not transfer money to The Mill Trust.  Rather, he transferred hundreds of thousands of dollars into an account held in the name of Monyet, LLC.

In December of 2010 the Debtor completed an application to open a checking account at TCF Bank in the name of Monyet, LLC.  The Debtor is the only authorized signer listed on the application, which allowed the Debtor to maintain compete control over the funds in that account.  Seaver Aff. Ex. 14 at 1[2].   The Debtor began transferring his personal funds into the Monyet TCF bank account through 2012.

Also in December of 2010, the Debtor completed a brokerage account application to open a new brokerage account at Scottrade in the name of Monyet, LLC("Monyet Scottrade Account").  Once again, the Debtor was the sole signatory on the Monyet Scottrade Account, and he signed a personal guarantee for the account. Swanson Aff. Ex. 1 at 1, 3-4.  In June 2012, the Debtor transferred over $500,000 from the Monyet account at TCF, emptying the account, to the Monyet Scottrade Account by way of check issued and endorsed by Hansmeier.  Seaver Aff. Ex. 15.

In total, Hansmeier transferred over $600,000 into the Monyet Scottrade Account.  The funds were never transferred to The Mill Trust.  Rather, they were in accounts in the name of Monyet, LLC, and the funds were always under the sole control of Hansmeier.

During 2012, almost all of the activity in the Monyet Scottrade Account, consisted of Hansmeier engaging in stock trades.   At the same time that he was actively trading stocks in the Monyet Scottrade Account, over which he had sole and unfettered control, Hansmeier was running into substantial financial difficulties as a result of his law practice.  A timeline setting forth sanctions and judgments sought and ordered against Hansmeier during that time period is attached to the Swanson Aff. as Ex. 2.

---

[2] "Seaver Aff." refers to the Affidavit of Randall L. Seaver.

3

In May of 2013, Hansmeier began the liquidation of the Monyet Scottrade Account with all payments being made for his personal benefit.  His personal use of those funds included the following:

- A May 15, 2013, transfer of $51,333.50 to account held by SureTec Insurance Company for the purpose of posting an appellate bond in 12-cv-8333 (*Ingenuity 13, LLC v. John Doe*) ("Ingenuity Bond").
- A June 27, 2013, transfer of $10,000 to an account held by Livewire Holdings, LLC, to repay funds;
- A June 28, 2013, transfer of $10,000 to an account held by Livewire Holdings, LLC, to repay funds.
- A July 15, 2013, transfer of $69,000 to an account held by SureTec Insurance Company for the Ingenuity Bond.
- A July 19, 2013, transfer of $10,000 to an account held by SureTec Insurance Company for the Ingenuity Bond.
- A July 26, 2013, transfer of $25,000 to an account held by Class Justice, PLLC, a law firm in which Hansmeier is the sole shareholder.  He had to start a new law firm because of sanctions against Alpha.  Debtor stated the reason for request was "Capitalize Law Firm".
- A July 30, 2013, transfer of $5,000 to Padraigin Browne.
- An August 7, 2013, transfer of $2,575 to Deutsche Bank to cover ADP payroll expenses.
- An August 27, 2013, transfer of $30,000 to Padraigin Browne.
- A September 25, 2013, transfer of $10,000 to Voelker Litigation Group for personal legal services (Voelker Litigation Group represented Hansmeier, Steele, and Duffy in the appeal to the Ninth Circuit Court of Appeals in *Ingenuity 13, LLC v. John Doe.*).
- An October 1, 2013, transfer of $25,000 to Class Justice, PLLC, Hansmeier's solely owned law firm.
- A November 19, 2013, transfer of $10,000 to Voelker Litigation Group, for personal legal services.
- A November 19, 2013, transfer of $20,000 to Class Justice, PLLC, Hansmeier's solely owned law firm.
- A November 22, 2013, transfer of $175,000 to Padraigin Browne.
- A December 9, 2013, transfer of $21,250 to Robert P. Balzebre.  Although Hansmeier's testimony is contradictory, those payments appear to be a payment on debt owed by Hansmeier's colleague, John Steele, to Robert P. Balzebre.
- A January 17, 2014, transfer of $20,000 to Class Justice, PLLC, Hansmeier's solely owned law firm.
- A February 7, 2014, transfer of $70,000 to Padraigin Browne.
- A March 19, 2014, transfer of $25,000 to Class Justice, PLLC, Hansmeier's solely owned law firm.
- A March 19, 2014, transfer of $3,750 to Voelker Litigation Group for personal attorney fees.
- A May 5, 2014, transfer of $39,231.25 to Chisholm Properties South Beach.  Although Hansmeier's testimony is contradictory, those payments appear to be a payment on debt

4

owed not by Hansmeier, but by Hansmeier's colleague, John Steele, to Robert P. Balzebre. Seaver Aff. Ex. 12 at 45-47.

See Seaver Aff. Ex. 11. The two transfers which are the focus of the Trustee's complaint are

transfers Hansmeier made to a TCF bank account held solely in the name of his spouse,

Padraigin Browne as follows:

   a.   On November 22, 2013, Hansmeier transferred $175,000 to an account at TCF Bank held solely in Browne's name.

   b.   On February 7, 2014, Hansmeier transferred $70,000 to an account at TCF Bank held solely in Browne's name.

Id.

As a part of the trustee's investigation, he obtained Rule 2004 authorization for both

Associated Bank and TCF Bank, and served subpoenas and supplemental subpoenas upon those

entities. After obtaining information from those banks and others, he conducted the February 18,

2016 Rule 2004 examination of Padraigin Browne. A copy of Browne's February 18, 2016 Rule

2004 examination, together with redacted copies of Exhibits 6 – 13 thereto are attached to Seaver

Aff., Ex. 6. As a result of his investigation, the trustee learned the following:

   a.   With respect to the $175,000 transfer to her TCF account, Padraigin Browne had withdrawn $150,000 in cash, consisting of 1,500 $100 bills on December 13, 2013. That cash was then hidden in a box in a closet in the condominium shared by the debtor and the defendant.

   b.   With respect to the $70,000 transfer to her TCF account, Browne engaged in a series of $2,000 cash withdrawals of the $70,000 transfer, resulting in an additional approximate amount of $30,000 in cash being withdrawn. That cash was also placed with the $150,000 previously withdrawn, resulting in approximately $180,000 in cash being held in a box concealed in the condominium shared by the debtor and the defendant, in early 2014.

As a part of the trustee's investigation, he also analyzed the cash deposits made into

Browne's Associated Bank account after the $180,000 in cash was concealed in the residence of

the debtor and Browne. According to Schedule B and the debtor's January 21, 2016 §341

testimony, it appeared that there remained $8,554 of that cash on the day of filing. Seaver Aff.

5

Ex. 1 at 1, and Ex. 12 at 6-7. However, his analysis of cash deposited back into Browne's account indicated a discrepancy between cash withdrawn and cash deposited, in an amount in excess of $60,000. Seaver Aff. at ¶ 8.

Confronted with this evidence, the Defendant at her Rule 2004 examination testified that she and the debtor had paid a large amount of cash to John Steele. She estimated that she believed it was $60,000. Seaver Aff. at ¶ 9, Ex. 6 at 60-62. The trustee has been told that there is no written receipt for this supposed $60,000 cash payment to John Steele.

As a part of the trustee's investigation, including the reconciliation of cash deposits, it became clear to him that Browne had deposited cash, derived from the cash withdrawals, into her account after commencement of the bankruptcy case that exceeded the stated remaining cash of $8,554. When confronted with this evidence, Browne admitted as follows:

> Q: So you had to have at least 20,900 in cash in your possession on July 13 of 2015?
>
> A: Yes, and I'm saying when we filed, I had spent that money, the 15,000 already, approximately, on various things and was paying – so I said that not there because I need to pay off my credit card, we just haven't paid it off yet, so we're going to say that that's not there, and then the 5,000 is part of the 8,000 that we were still saying was part of the trust.
>
> Q: So you and Mr. Hansmeier sat down and counted out how much was left in there, correct?
>
> A: Yes.
>
> Q: Okay.
>
> A: Pretty close, I mean, there was probably some ones and stuff lying around.
>
> Q: And what did you come up with for a total?
>
> A: I don't remember exactly how much it was.
>
> Q: Okay. And then you and he talked and decided rather than stating how much cash was actually there, you would deduct for cash that was – for things that you were going to pay in the future?

6

A:  For things that had already been purchased on my credit cards that needed to be paid off.  They had already – I had already, bought them, we had the things.

Seaver Aff. Ex. 6 at 66 to 67.

As a result of the trustee's investigation, he also discovered that, after commencement of this bankruptcy case, the defendant had deposited into an account held solely in her name, proceeds from the sale of Minnesota Viking's tickets held in the name of the debtor's deceased grandfather and, according to the debtor in his statement of financial affairs, paid for by the debtor's law firm.  The deposits were in the following amounts:

| | |
|---|---|
| September 15, 2015 | $350.20 |
| September 23, 2015 | $168.30 |
| September 29, 2015 | $360.40 |
| October 9, 2015 | $314.50 |
| October 16, 2015 | $299.20 |
| November 11, 2015 | $336.60 |

Seaver Aff. at ¶ 11.

As a part of the trustee's investigation, he also discovered that although not listed in the debtor's Schedule B, the debtor and the defendant received a 2014 property tax refund of $2,120 in August, 2015.  That was also deposited into an account held solely in the name of the defendant.  Seaver Aff. at ¶ 12.

As a part of the trustee's investigation, he also discovered that on July 9, 2015, $20,000 of the cash still concealed in the home was deposited by the defendant into her Associated Bank account ending in #1853.   Immediately after that $20,000 cash was deposited into the account, Browne wrote a check to Barbara May in the amount $15,305 as payment to Barbara May for the debtor's Chapter 13 bankruptcy.  A copy of the check is attached to Seaver Aff., Ex. 7.  The debtor's statement of financial affairs and the statement of compensation filed by Barbara May and verified by the debtor, both indicate that the payment to Ms. May was from the debtor. Copies of the relevant page of the statement of financial affairs and the statement of attorney are

7

attached to Seaver Aff. Ex. 8.  After the $20,000 cash deposit and the payment to Ms. May, there was a remaining balance in the Associated Bank account held in Browne's name of $7,709.64. A redacted copy of that statement is attached to Seaver Aff. Ex. 9.

At item 19d of the statement of financial affairs, the debtor indicated that no financial statement had been issued by the debtor in the two years immediately preceding the commencement of the case.  During the course of his investigation, the trustee learned that the U.S. District Court in the *Lightspeed*[3] case, docket entry 123, on February 13, 2014, had ordered the debtor to produce an asset statement to the Court.  The trustee then demanded that the debtor provide a copy of the financial statement.  A copy of that statement of financial condition is attached to Seaver Affidavit as Exhibit 10.   The financial statement evidences two relevant facts 1) Hansmeier was pleading insolvency to a Federal Court in December of 2013; and 2) Hansmeier admits that the portion of the bond that he posted in the Ingenuity 13, LLC case is his personal property.  The statement provided by Hansmeier to the U.S. District Court as a representation of his financial situation on December 1, 2013, indicates that his liabilities exceed his assets by over $338,000.[4]

Hansmeier, himself, has admitted to this Court, and at least one other Court, that certain supposed Monyet, LLC assets are his personal property.  Hansmeier has represented to this Bankruptcy Court in his schedules, the following:

1. He owns a ½ interest in the supercedeas bond posted with appellate court in the *Ingenuity 13, LLC v. John Doe* case, which one half interest has a value of $118,791. This bond was posted by Hansmeier using funds he transferred from the Monyet Scottrade Account and he has thereby admitted that those funds are bankruptcy estate property.  Schedule B, item 2.

2. "Self settled trust monyet" $8,554.  He has admitted to joint ownership of this asset. In truth, this asset consists of a supposed total of $8,554 in cash hidden in the debtor's

---

[3] *Lightspeed Media Corp. v. Anthony Smith, et al.,* Case 12:-cv-00889, U.S. District Court for Southern District of Illinois.

[4] It appears that Hansmeier intentionally concealed from the U.S. District Court, his ownership interest in Class Justice, LLC.  He had capitalized, or loaned money to that entity in the amount of at least $70,000.00, by December 1, 2013, all of which he had transferred to that entity from the Monyet, LLC Scottrade account.

8

condominium on the day of filing. In truth, the amount of cash hidden in the debtor's condominium on the day of filing, exceeded $20,000.

3. Barbara May Email regarding $60,000 bond. Hansmeier admitted at the second phase of his §341 meeting that an email from his attorney, Barbara May, was true. The essence of that email was that $60,000 in cash apparently given to John Steele, which had been part of the cash hidden in Hansmeier's home, was property of Hansmeier. Swanson Affidavit, Exhibit 3. Hansmeier also admitted through his testimony, at least twice at the continued §341, that he made a $60,000 payment to Steele. See pages 18 to 19, and 42 to 43 of his testimony. Seaver Affidavit, Exhibit 13.

4. At item 9 of his Statement of Financial Affairs, Hansmeier confirmed that the payment of $15,000 in attorneys' fees to Barbara May was made with the debtor's funds. He made the same admission at the Disclosure of Compensation of Attorney for Debtor. The payment to Barbara May came from cash hidden in Hansmeier's home and deposited into an account held in the name of Browne on July 9, 2015. See Seaver Aff. Ex. 6 at 50.

5. Admission to U.S. District Court. Hansmeier was ordered to produce a financial statement to the U.S. District Court in the *Lightspeed* matter. He produced a document reporting to set forth his financial condition as of December 1, 2013. In that statement, provided to the U.S. District Court, he indicated an asset of his was a $125,000 security bond.[5] Seaver Aff. Ex. 10 at 2.

## ARGUMENT

Federal Rule of Civil Procedure 64, made applicable through Federal Rule of Bankruptcy

Procedure 7064, governs "seizure of person or property" in federal court. This rule specifically

provides that:

> At the commencement of and during the course of an action, all remedies
> providing for seizure of person or property for the purpose of securing satisfaction
> of a judgment ultimately to be entered in the action are available under the
> circumstances and in the manner provided by the law of the state in which the
> district court is held, existing at the time the remedy is sought . . . .

---

[5] In that financial statement, Hansmeier concealed from the U.S. District Court his ownership of Class Justice, LLC, which by December 1, 2013, had already received financing by wire transfers made by Hansmeier from the Monyet Scottrade Account, in an amount of $65,000.

Minnesota Statute § 570.01 is the prejudgment attachment statute which gives the bankruptcy

court court authority to attach assets as security for satisfaction of a final judgment. *See* Minn.

Stat. § 570.01.

   Minnesota Statute § 570.026 provides for an attachment order following a hearing, where

movant files a motion, filed with an affidavit, setting forth in detail:

1. the basis and amount of the claim in the civil action; and
2. the facts which constitute one or more of the grounds for attachment as specified in section 570.02.

The Affidavit of Randall L. Seaver, filed herewith, sets forth the basis and amount of the claim in

the civil action.  In conjunction with the facts set forth in the Plaintiff's affidavit, and this

memorandum, grounds exist warranting an attachment order pursuant to Minn. Stat. § 570.02.

## I.    <u>Attachment is Justified and Appropriate</u>

   According to the facts set forth in the Plaintiff's affidavit, and as described herein,

grounds exist in this matter and support entry of order for attachment as a result of the following

grounds being met:

1. when the respondent has assigned, secreted, or disposed of, or is about to assign, secrete, or dispose of, any of the respondent's nonexempt property, with intent to delay or defraud the respondent's creditors; Minn. Stat. § 570.02 Subd. 1(1)

2. when the respondent has converted or is about to convert any of the respondent's nonexempt property into money or credits, for the purpose of placing the property beyond the reach of the respondent's creditors; Minn. Stat. § 570.02 Subd. 1(2)

3. when the respondent has committed an intentional fraud giving rise to the claim upon which the civil action is brought; Minn. Stat. § 570.02 Subd. 1(4)

Minn. Stat. § 570.02 Subd. 1.

   The Defendant's actions, in concert with her husband, unequivocally establish that the

Defendant has exhibited a pattern of deception and fraud in an attempt to evade the debtor's

creditors and bankruptcy estate.

   a.   <u>Conversion and Concealment of Monies.</u>
        <u>Minn. Stat. § 570.02 Subd. 1(1) & (2)</u>

10

The Defendant and her spouse worked in concert to conceal and transfer funds out of the reach of creditors, including the conversions of funds in financial accounts to cash.  The Debtor transferred in excess of $245,000 to the Defendant in the midst of judgments and sanctions being entered against him.  Seaver Aff. Ex. 11.  Following those transfers to the Defendant's account, the Defendant converted over $180,000 of those funds to cash and hid those monies in a box in the debtor and Defendant's condominium.  When questioned at her February 18, 2016 Rule 2004 examination the Defendant admitted that in an attempt to keep the assets she converted the subject funds to cash in order to avoid creditors, or the court, from freezing the accounts. Seaver Aff. Ex. 6 at 22.

The Debtor and Defendant were both questioned, under oath, regarding the use of the funds transferred to Defendant, and both testified that the funds were used for ordinary living expenses.  Seaver Ex. 2 at pp. 43 and 46, and Ex. 3 at pp. 40 and 42.  Once the Plaintiff was able to obtain financial records for the Defendant's bank accounts the Plaintiff was able to discern that over $60,000 of the withdrawn cash was unaccounted for.  Once confronted with this truth the Defendant admitted, despite her prior testimony, that approximately $60,000 had been transferred to the Debtor's former law partner, John Steele.  Seaver Aff. Ex. 6 at 60.

The Defendant has also conspired with the Debtor to conceal from this court, the estate, trustees and creditors the true amount of funds held in cash on the filing date.  According to the Debtor's schedule B, he had an interest in $8,554 of cash relating to the Monyet, LLC as of the filing of his petition.  Seaver Aff. Ex. 1 at 1.  The truth is that the actual amount of cash relating to the Monyet, LLC exceeded $20,000, and the Debtor and Defendant sat down together, counted the money, and decided Debtor would only report a fraction of the funds to the Bankruptcy Court. Seaver Aff. Ex. 6 at 66-67.

The cash for which the Plaintiff seeks an attachment order is from the sale of the Debtor and Defendant's homestead.  That property was listed for sale after the filing of the Debtor's

11

bankruptcy petition.  Debtor and Defendant did not notify the Chapter 13 trustee of their

intention to sell the real property, and absent discovery efforts by a creditor, the Debtor and

Defendant may have sold the real property and concealed the sales proceeds, which exceed their

statutory exemption amount.

> b.  Plaintiff's Claim is Based on Defendant's Intentional Fraud.
> Minn. Stat. § 570.02 Subdiv. 1(4)

The Plaintiff's claim against Defendant arises under 11 U.S.C. § 548(a), seeking to avoid

an intentionally fraudulent transfer.  The Plaintiff seeks recovery of $245,000, which constitutes

funds that the Debtor transferred to the Defendant in an effort to hinder, delay, and defraud

creditors(the "Pre-Petition Transfers").

Defendant has admitted, under oath, that the funds which are at issue in Adv. No. 16-

4031 relate to a transfer made with the intent to remove and conceal the property from the reach

of creditors. Seaver Aff. Ex. 6 at 22.  The Defendant then testified under oath, that the funds had

been spent on ordinary living expenses, which she knew was a lie.  Seaver Aff. Ex. 6 at 22.  She

also testified that the Debtor lied about the amount of cash remaining at the time of his

bankruptcy filing.  Seaver Aff. Ex. 6 at 66-68.

## II.     The Plaintiff will Prevail on the Merits of his Claims Against Defendant

Pursuant to Minn. Stat. § 570.026 Subd. 3, in addition to showing that grounds exist

under § 570.02 for an attachment order, the Plaintiff must also demonstrate the probability of

success on the merits.  The two claims in front of the Court in Adv. No. 16-4031 are: 1) that the

funds held in the Monyet, LLC Scottrade account were the property of the Debtor; and 2) that the

debtor's transfers of those funds to Defendant are avoidable as fraudulent transfers pursuant to

11 U.S.C. § 548.

The Complaint, as filed by the trustee, seeks to avoid and recover from Browne, both a

November 22, 2013, transfer in the amount of $175,000, and a February 7, 2014 transfer in the

12

amount of $70,000.  As will be seen by the following analysis, the trustee will be successful

against Browne on those claims.


### A.    Monyet, LLC and The Mills Trust were the alter egos of the Debtor and the monies in the Monyet Scottrade Account were his property.

Under Minnesota Law, courts use a two prong analysis to determine whether or not a

legal entity is the alter ego of an individual.  *Victoria Elevator Co. of Minneapolis v. Meriden*

*Grain Co.,* 283 N.W.2d 509, 512 (Minn.1979).

### a.    Hansmeier's Relationship with Monyet, LLC and The Mill Trust

Under the *Victoria Test* the court is to first examine the relationship between Hansmeier and

Monyet, LLC, observing the reality of how the entity operated, regardless of the form.   The

relevant factors to this determination include:

> insufficient capitalization for purposes of corporate undertaking, failure to
> observe corporate formalities, nonpayment of dividends, insolvency of debtor
> corporation at time of transaction in question, siphoning of funds by dominant
> shareholder, nonfunctioning of other officers and directors, absence of
> corporate records, and existence of corporation as merely facade for
> individual dealings.

*Id.*  The facts set forth in the attached affidavit establish a number of the factors required by the

*Victoria test*:

### i.    Hansmeier observed no formalities in his dealings with The Mill Trust and Monyet, LLC

Monyet, LLC is a limited liability company that was purportedly created to hold the

assets of The Mill Trust. The Mill Trust documents state that the trust was created for the benefit

of Hansmeier's future spouse(Defendant), siblings, and parents.  Swanson Aff. Ex. 4, at 1.

Pursuant to the trust agreement for The Mill Trust, the Defendant is the sole trustee of The Mill

Trust and has sole authority over the distribution of the trust's assets.  Id.  Hansmeier's only

supposed right as to the distribution of trust assets is a right to veto proposed transfers.  Id. at 1-2.

13

Despite these legal formalities, Hansmeier was the individual that caused the transfer of the "trust" monies at his own discretion and without limitation.  Seaver Aff. Ex. 11.  Hansmeier is not a named beneficiary of The Mill Trust.  However, except for the funds transferred to the Defendant, to conceal in their home, essentially all of the transfers of the "assets" of The Mill Trust are being directed by Hansmeier for the benefit of Hansmeier.

Hansmeier also transferred at least $90,000.00 from the Scottrade Monyet Account to his law firm Class Justice, PLLC.  Seaver Ex. 11.  These transfers were made without any written agreements or any evidence of authorization from the trustee of The Mill Trust.  At his January 21, 2016, section 341 meeting of creditors, the Debtor admitted that the transfers to his law firm were undocumented.

The Debtor ignored the legal structures of The Mill Trust and Monyet, LLC and used it as just another bank account for his use.  Hansmeier never relinquished control of the funds transferred to the purported "trust", and the funds were never actually deposited into an account in the name of The Mill Trust.  The funds were only deposited were Hansmeier had unfettered access, and could use them for his personal benefit, as he did.

      ii.     <u>Defendant as the trustee of The Mill Trust legally had control over the use of the trust assets; however she was essentially a non-functioning figurehead to create the illusion of ownership and control</u>

Defendant had no access to the monies while they were in the Monyet, LLC Scottrade account.  The Debtor was the sole signatory on the Monyet Scottrade Account.  Despite her position as the trustee of The Mill Trust, the entities were created in a way that provided Defendant no access to the trust assets.  The Defendant and The Mill Trust were used to provide yet another layer of the façade to conceal assets from the Debtor's creditors.  Once the Debtor's creditors had discovered the existence of Monyet, LLC, and purported trust, the Debtor lied to the attorney for the creditors, under oath, in an attempt to conceal the monies transferred by the Debtor from the Monyet Scottrade Account, including the transfers at issue in this adversary

proceeding.  Seaver Aff. Ex. 4 at 3 and Ex. 5 at 4-5. (Debtor testified he didn't know where the Monyet funds were and didn't think he had access to them).

> iii.   there is a complete absence of records as it relates to the purported loans and transfers made from Monyet, LLC

As described herein and evidenced in the attached Affidavit, Hansmeier made over a dozen transfers out of the Monyet Scottrade Account, including transfers to his law firm, to attorneys for personal legal expenses, posting appellate bonds, and making purported loans. There are no loan documents relating to these transfers, or written evidence that any of these transfers were authorized by the Defendant as the supposed trustee of The Mill Trust.

The two entities' records consist solely of their formation documents.   No operational documents or accounting records outside of bank statements appear to exist; nor does it appear any yearly accounting records are maintained.  When questioned, at her October 28, 2015 examination, regarding the maximum amount contained in the trust the Defendant testified as follows:

> Q:   What was the most the trust ever had?
>
> A:   I don't know.
>
> Q:   Who would know?
>
> A:   I don't know
> .
> Q:   You don't know who would know about –
>
> A:   I don't know if anyone would know how much it had, what the maximum amount that was ever in it.
>
> Q:   Well, there would be some bank record of some sort, wouldn't there?
>
> A:   I don't know.
>
> Q:   You don't know?
>
> A:   That's correct.

15

> Q:      You're the trustee of this trust, right?
>
> A:      That is correct.

Seaver Aff. Ex. 3 at 40-41.  As trustee of The Mill Trust, the Defendant apparently did not keep

a record of the assets in the trust.

> iv.    <u>Hansmeier used Monyet, LLC as a mere façade for his individual</u>
>        <u>dealings</u>

Finally, the evidence of the self-dealing transfers is consistent with Hansmeier's prior

conduct with his law firm's entity, Alpha Law Firm.  The Minnesota Appellate Court, agreeing

with the district court, recognized this behavior:

> The district court also found that Hansmeier was using Alpha as a façade to perpetrate
> fraud on the court, citing the fact that Hansmeier and Dugas misrepresented which of
> them was employed by Alpha and Hansmeier later attempted to convince the court that
> Prenda Law, not Alpha, was the law firm of record for Guava.

See *Guava, LLC v. Merkel*, 2015 WL 4877851, at 7 (Minn. App. Aug. 17, 2015)(citing district

court holding); See Swanson Aff. Ex. 7 at 17.  The Debtor maintains that the funds in the

Monyet Scottrade Account are held in trust, and not property of the Debtor or his bankruptcy

estate.   Seaver Aff. Ex. 13 at 23-24.  However, the Debtor on his own accord has used those

funds for his personal expenses, including loans to his new law firm, payments on account of a

former business partner's debt and posting appellate bonds to appeal personal sanctions awards.

See Seaver Aff. Ex. 11.   The Debtor never treated the purported "trust assets" as if they were

part of a trust, or as if he had relinquished control of the assets.

Finally, the Debtor's clear disregard of an established "trust" is evidenced by his scheduling of 1)

an interest in the "Self Settled Trust Monyet"; and 2) an interest in an appellate bond in his

Schedule B. Seaver Aff. Ex. 1 at 1-2.  The Debtor's disclosure of the "Self Settled Trust

Monyet" is false, Monyet is clearly not a trust, and the Debtor was aware of this fact when filing

his bankruptcy petition and schedules.  The Debtor testified under oath, clarifying prior

testimony, that Monyet, LLC was not a trust.  Seaver Aff. Ex. 5 at 3.

Hansmeier's verified Schedule B, filed with his Chapter 13 petition on July 13, 2015,

disclosed his one half interest in a supercedeas bond, which he valued at $118,791.  Seaver Ex. 1

at 1.  That supercedeas bond was posted in the *Ingenuity 13* case, and was funded by monies

Hansmeier wired directly from the Monyet Scottrade Account.  Seaver Aff. Ex. 11.  The

appellate bond is just one example of the multiple instances where Hansmeier was the clear

beneficiary of self-directed transfers from the purported "trust", regardless of what the actual

trust documents state.

Despite the Debtors acknowledgment to this Court, through his Schedule B, of his

interest in the Monyet funds, and the funds he transferred to secure a supercedeas bond, the

Debtor has lied under oath in order to conceal these interests from his creditors.  After

Hansmeier had posted the appellate bond, using over $100,000 from the Monyet Scottrade

Account, and before any decision had been returned from the appellate court, Hansmeier testified

under oath on July 2, 2014, that he didn't know where the monies in Monyet, LLC were located,

and that he didn't think he could "get any of it".  Seaver Aff. Ex. 5 at 4-5.  This testimony was

clearly false, and intended to mislead his creditor.

On July 26, 2013, Paul Hansmeier authorized the transfer of $25,000 from the Monyet

Scottrade Account to an account in the name of Class Justice, PLLC.  Hansmeier described the

reason for the transfer on the authorization form as "Capitalize Law Firm".  Seaver Aff. Ex. 11.

Monyet, LLC is not an owner of Class Justice, PLLC, nor is the Defendant.  The transfer of

$25,000 to "capitalize law firm" was a transfer by Paul Hansmeier, for the benefit of Paul

Hansmeier.   On August 7, 2013, Paul Hansmeier transferred $2,575 from the Monyet Scottrade

17

Account to apparently cover payroll expenses for his law firm, Class Justice, PLLC.  Seaver Aff.

Ex. 11.  The transfers made to Class Justice, LLC or on account of Class Justice, LLC evidence

the Debtor's use of Monyet, LLC for his personal dealings.

> **b.      It would be fundamentally unfair to allow the Debtor's use of the legal form as a façade to hinder, delay and defraud creditors.**

The second and final prong of the *Victoria Test* requires "the veil-piercer to show that

there was 'an element of injustice or fundamental unfairness' that would result from not piercing

the corporate veil."  *Victoria Elevator,* 283 N.W.2d at 512. Injustice or unfairness is present if

the individual has used the legal entity's form to gain "an advantage he does not deserve." *Id.*

"Proof of strict common law fraud is not required, but ... evidence that the corporate entity has

been operated as a constructive fraud or in an unjust manner must be presented." *Equity Trust*

*Co. v. Cole,* 766 N.W.2d 334 at 340 (Minn. Ct. App. 2009)(quoting *Groves v. Dakota Printing*

*Servs., Inc.,* 371 N.W.2d 59, 62–63 (Minn.App.1985)).

The purpose of The Mill Trust and Monyet, LLC was shield monies from creditors while

maintaining complete control over the funds.  This is evidenced by Hansmeier's unfettered use

of the monies which, on paper, where property of an irrevocable trust.  The truth is that the trust

was a paper fallacy created so Hansmeier could use the funds at his sole discretion without

interference from his creditors.

Hansmeier continued this fraud when questioned under oath by a creditor, wherein

Hansmeier testified that he didn't know where the money in Monyet, LLC was located, and

didn't think he could get any of it.  Seaver Aff. Ex. 5 at 4-5.  This testimony was provided amidst

Hansmeier's active use of the funds held in the Monyet, LLC Scottrade account.  Seaver Aff. Ex.

11.  The numerous undocumented transfers from the Monyet Scottrade Account are evidence

that the account was merely an instrument of the Debtor, used to frustrate efforts of his creditors

and the bankruptcy trustee.  The Debtor has used the legal entities of The Mill Trust and Monyet,

LLC in an improper and unjust manner.  The facts in this matter justify a finding that The Mill

18

Trust and Monyet, LLC are the alter egos of Paul Hansmeier, and satisfy the Trustee's burden on this motion.

### B.      The Transfers to Defendant are Avoidable as Actually Fraudulent Transfers

The Plaintiff's second claim is an action to avoid two pre-petition transfers totaling $245,000(the "Pre-Petition Transfers").  The Pre-Petition Transfers are transfers from the Monyet Scottrade Account to the Defendant's personal TCF Account, and then liquidated to cash by the Defendant.  Section 548 of the Bankruptcy Code provides, in relevant part:

> (a)(1) The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation … incurred by the debtor, that was made or incurred on or within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted;

*See* 11 U.S.C. § 548(a)(1)(A).  There is no factual dispute that Hansmeier transferred $245,000 from the Monyet Scottrade Account to the Defendant's personal TCF Bank account, and that the Defendant then liquidated those monies to cash.  Hansmeier exhibited all indicia of ownership when the funds were transferred.  The remaining question under 11 U.S.C. § 548(a)(1)(A) is whether or not the transfers were made with actual intent to "hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."

The Eighth Circuit has recognized that since direct evidence of such intent is rarely forthcoming, court may make inferences on the issue "from the circumstances surrounding the transfer."  *See In re Northgate Computer Systems, Inc.,* 240 B.R. 328, 360 (Bankr.D.Minn.1999), citing *In re Sherman,* 67 F.3d 1348, 1353 (8th Cir.1995). "The courts recognize that certain sorts of events, conditions, or characteristics frequently accompany the execution of a scheme to defraud third-party creditors." *Northgate,* 240 B.R. at 360. "The presence of several or more of these 'badges of fraud' gives rise to a presumption of fraudulent intent." *Northgate,* 240 B.R. at

360, citing *Kelly v. Armstrong,* 141 F.3d 799, 802 (8th Cir.1998); *In re Bateman,* 646 F.2d 1220,

1223 (8th Cir.1981); *In re Sherman,* 67 F.3d at 1353–1354.  In determining intent the court

examines the non-exclusive badges of fraud set forth in Minn. Stat. § 513.44(b):

1.  the transfer or obligation was to an insider;
2.  the debtor retained possession or control of the property transferred after the transfer;
3.  the transfer or obligation was disclosed or concealed;
4.  before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
5.  the transfer was of substantially all the debtor's assets;
6.  the debtor absconded;
7.  the debtor removed or concealed assets;
8.  the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
9.  the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and
11. the debtor transferred the essential assets of the business to a lienor was transferred the assets to an insider of the debtor.

*See* Minn. Stat. § 513.44(b); *Northgate,* 240 B.R. at 361, n. 45, citing *In re Sherman,* 67 F.3d at

1353; *Kelly,* 141 F.3d at 802.

The Defendant has admitted the fraudulent intent behind the transfers from the Monyet

Scottrade Account, to her account, and the subsequent liquidation to cash.  In response to the

Plaintiff's questioning as to why she converted $150,000 of the funds transferred to her from her

husband to cash, Defendant testified :

Because we were – I wanted to make sure that we were still able to make our payments on our everyday living expenses.  We had recently had a judgment entered against Paul without him being served at all or being aware of it and I was concerned that, because the attorneys that were representing people against him were getting things without letting us know, that they would freeze my account without ever letting us know and we wouldn't be able to pay for things.

Seaver Aff. Ex. 6 at 22.  This is direct evidence of the fraudulent intent required by §

548(a)(1)(A).

20

In addition to the direct evidence of intent provided by Defendant's testimony, the facts in this case also satisfy a majority of the badges of fraud. The presence of several badges of fraud gives rise to a presumption of fraudulent intent. *Kelly,* 141 F.3d at 802. Here the Debtor's actions satisfy 9 of the 11 badges. Based on the facts presented in the attached affidavit, and discussed herein, the following badges have been satisfied evidencing the Debtor's fraudulent intent:

<u>i.    The transfer or obligation was to an insider</u>

The transfers at issue were transfers to the Debtor's spouse, who is a statutory insider pursuant to 11 U.S.C. § 101(31)(A)(i).

<u>ii.    The Debtor retained possession or control of the property transferred after the transfer</u>

The transferred funds were initially placed in Browne's personal bank account, but were then reduced to cash and placed in a closet in the Debtor's home. Seaver Aff. Ex. 6 at 23-24. Defendant has testified that the Debtor had access to those funds. Id. at 24. The Debtor also testified at his 2nd 341 Meeting of Creditors that he transferred $60,000 of the concealed cash to a former business partner; "I obviously transferred cash to him in the amount of about 50 to $60,000 sometime in 2014." Seaver Aff. Ex. 13 at 22. The Debtor also had $20,000 of the cash deposited into Browne's Associated Bank account in order to pay his bankruptcy attorney's legal fee, a payment the Debtor and his attorney verified as being from the Debtor. Seaver Aff. Ex. 7 and Ex. 8.

<u>iii.    The transfer or obligation was disclosed or concealed</u>

The Debtor did not disclose any of the transfers at issue in his statement of financial affairs. When questioned regarding The Mill Trust and Monyet, the Debtor feigned ignorance in an effort to avoid disclosing the truth. Seaver Aff. Ex. 5 at 4-5. The Debtor also failed to

21

disclose his position as the manager of Monyet, LLC in his statement of financial affairs.  The

filing of the Debtor's bankruptcy petition was intended, at least in part, to avoid disclosing

financial information in State court.

                      iv.      <u>Before the transfer was made or obligation was incurred, the debtor had
been sued or threatened with suit</u>

At the time of the Pre-Petition Transfers to Defendant the Debtor had already been found

liable for substantial attorney's fee awards.  See Swanson Aff. Ex. 2.  Nine days prior to the

$175,000 transfer to Defendant, the Debtor was party to a motion in the United States District

Court of the Southern District of Illinois where the court held a hearing on a motion to hold the

Debtor personally liable for attorneys' fees and expenses totaling over $250,000.  Id.  At the time

of the February 7, 2014 transfer to Browne, a motion had been filed to hold Hansmeier liable for

yet another award of attorney's fees in the Fourth Judicial District of the State of Minnesota.  Id.

                      v.      <u>The transfer was of substantially all the debtor's assets</u>

The Pre-Petition Transfers were part of over $250,000 in transfers from the Debtor to the

Defendant, which constituted a substantial portion of the Debtor's non-exempt assets at that

time.  This is evidenced by the financial statement the Debtor provided to the U.S. District Court

for the Southern District of Illinois in early 2014.  According to the financial statement the

Debtor was insolvent as of December 1, 2013.  Seaver Aff. Ex. 10 at 2.

                      vi.      <u>The debtor removed or concealed assets</u>

The Pre-Petition Transfers to Browne removed the funds from the Debtor's creditors, and

Hansmeier testified in a misleading or false manner about the funds in order to conceal those

funds.

                      vii.      <u>The value of the consideration received by the debtor was not reasonably
equivalent to the value of the asset transferred or the amount of the
obligation incurred</u>

There is no evidence of the Debtor receiving any value in exchange for the transfer of

$245,000 to the Defendant.  As testified by the Defendant, the transfer served the purpose of

removing the funds from the reach of the Debtor's creditors.  Seaver Aff. Ex. 6 at 22.

viii.  <u>The debtor was insolvent or became insolvent shortly after the transfer<br>was made or the obligation was incurred</u>

As discussed above, the Debtor provided a financial statement to the U.S. District Court for the Southern District of Illinois in early 2014.  That financial statement covered the same time period when the Pre-Petition Transfers were made, and evidences the Debtor's insolvency pursuant 11 U.S.C. § 101(32)(A), as his debts exceeded his non-exempt assets by over $300,000. Seaver Aff. Ex. 10 at 2.

ix.  <u>The transfer occurred shortly before or shortly after a substantial debt was<br>incurred</u>

Five days after the transfer of $175,000 to Defendant, judgment was entered against Hansmeier in the amount of $261,025.31.  See Swanson Aff. Ex. 2.  As evidenced herein, and in Ex. 2 attached to the Affidavit of Matthew Swanson, the Pre-Petition Transfers to Browne were made at a time when creditors were obtaining judgments and sanctions orders against the Debtor. The Defendant has testified that she converted funds to cash because she was concerned with the funds being frozen by courts.  Seaver Aff. Ex. 6 at 22.  That concern had arisen out of debts being incurred by her husband, and the threat of additional sanctions orders resulting from similar litigation tactics.

The list of badges provided by Minn. Stat. § 513.44(b) is not an exhaustive list.  The Plaintiff believes that another badge of fraud is applicable in this case, and asks the court to consider it as an additional badge of fraud:

x.  <u>The recipient of the transfer actively participated in the fraudulent<br>behavior.</u>

The Defendant is a licensed attorney.  She is charged with understanding the importance of being candid while testifying under oath.  Nevertheless, the Defendant has actively engaged in her husband's attempt to conceal assets from creditors and from the court.

23

On October 28, 2015 the Defendant was questioned under oath in a Rule 2004 examination.  At that examination the testified as follows:

> Q(Sheu):  … And then stop where it says the November 22, 2013 transfer of $175,000 to you from Monyet, Scottrade account. What was this for?
>
> A(Defendant):  For personal and everyday living expenses.
>
> Q:  $175,000?
>
> A:  That's correct
>
> …
>
> Q:  … I'll have you turn, skip the next page and then stop at the next one where there's the $70,000 transfer to you from Monyet, Scottrade account on February 7, 2014.  Do you know what that was used for?
>
> A:  That money was used for everyday living expenses.
>
> Q:  What expenses are those?
>
> A:  Our mortgage, daycare, my personal car payment, food, utilities.  I don't know, what everybody spends money on.

Seaver Aff. Ex. 3 at 40, 42.   The Defendant knew this testimony was a lie, or at best misleading.

Defendant testified under oath again on February 18, 2016, and after being confronted with the fact that she could not account for a large sum of the concealed cash, the Defendant finally admitted that the money was not used solely for "everyday living expenses".

> Q(Trustee):  Even if that is cash.  So 79 and 35 gets you to 114,000. That leaves $66,000 of cash that we don't see coming into any of these accounts?
>
> A(Defendant): Yeah.
>
> Q:  Where is the money?
>
> A:  It went to John Steele to pay for one of the bonds for the appeal.
>
> Q:  How much went to Mr. Steele?
>
> A:  I think 60.

24

Seaver Aff. Ex. 6 at 60.

Defendant's cooperation in this scheme to defraud creditors is further evidenced by her participation in concealing the true value of cash relating to Monyet, LLC.  The Debtor's Scheduled B states that he possessed $8,554 in the "Self Settled Trust Monyet"; which was actually cash located in a box in his condominium.  The Trustee discovered that the scheduled $8,554 was actually cash, and after tracing the cash withdrawals questioned Defendant as to a discrepancy in the remaining balance, Defendant testified as follows:

> Q:    So you had to have at least 20,900 in cash in your possession on July 13 of 2015?
>
> A:    Yes, and I'm saying when we filed, I had spent that money, the $15,000 already, approximately, on various things and was paying – so I said that's not there because I need to pay off my credit card, and then I deposited it afterwards.  Just because he hadn't – just because he listed 8,500, we said, well, we've already spent that money on a credit card, we just haven't paid it off yet, so we're going to say that that's not there, and then the 5,000 is part of the 8,000 that we were still saying was part of the trust.
>
> Q:    So you and Mr. Hansmeier sat down and counted out how much money was left there, correct?
>
> A:    Yes.
>
> Q:    Okay.
>
> A:    Pretty close.  I mean there was probably some ones and stuff lying around.
>
> Q:    And what did you come up with for a total?
>
> A:    I don't remember exactly how much it was.
>
> Q:    Okay.  And then you and he talked and decided rather than stating how much cash was actually there, you would deduct for cash that was – for things that you were going to pay in the future.
>
> A:    For things that had already been purchased on my credit cards that needed to be paid off.  They had already – I had already,

25

essentially, bought them, we had the things.

Q:      You charged them on your cards?

A:      Yes, and it needed to be paid off.

Q:      All right.  But we know there's at least an additional $500 or so
        that you testified earlier today that still exists, right?

A:      Yes.

Q:      So we know that there was over $21,000 in cash on the day you
        filed bankruptcy, correct?

A:      Yes.

Seaver Aff. Ex. 6 at 66-67.   The Defendant admitted that she decided, with the Debtor, to

conceal the true amount of cash in their possession.  These are two licensed attorneys, gathering

information to be included in the Debtor's bankruptcy schedules, and deciding to falsify the

information.  The Debtor then proceeded to verify the bankruptcy schedules containing the false

value.

        In addition to the sworn testimony of the Defendant, establishing the required intent

under § 548(a)(1)(A), the facts in this case, as set forth above and in the attached affidavit,

establish numerous badges of fraud.  The evidence overwhelmingly establishes the Plaintiff's

likelihood of success as to count II of the Complaint.

## <u>CONCLUSION</u>

        Based on the actions of the Defendant in conjunction with the actions of the Debtor, the

Plaintiff believes that if the Defendant receives the non-exempt monies being held by the

Plaintiff, pursuant to this Court's order regarding the condominium sale, Browne will

immediately dispose of or conceal those funds, and those funds will no longer be available for

recovery by the bankruptcy estate in this litigation against Browne.  When sanctioning the

Debtor in the *Ingenuity 13, LLC* case, Judge Otis Wright in his May 6, 2013 decision recognized

the tendencies of the Debtor, stating "[e]ven if the Court enters such a sanction, it is certain that

26

Plaintiffs will transfer out their settlement proceeds and plead paucity." Swanson Aff. Ex. 5 at 9. The Debtor has a history of shifting and concealing assets in order to avoid paying his creditors, and as described above the Defendant has been a willing participant.  Approval of the Plaintiff's motion is necessary to prevent further concealment of any non-exempt assets.

The Plaintiff has satisfied the requirements of Minn. Stat. § 570.02 and 570.026. Grounds exist for the Court to enter an order of attachment to any non-exempt funds of the Defendant which are currently in the possession of the Plaintiff, as security for the judgment the Plaintiff seeks in Adversary No. 16-4031.

**FULLER, SEAVER, SWANSON & KELSCH, P.A.**

Dated: April 13, 2016                    By: /e/ Matthew D. Swanson
                                                         Matthew D. Swanson                    390271
                                                         Randall L. Seaver                         152882
         12400 Portland Avenue South, Suite 132
         Burnsville, MN 55337
         mswanson@fssklaw.com
         Telephone: 952-890-0888